Filed 3/18/16

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| CALIFORNIA CANNABIS COALITION et al., | E063664 |
| Plaintiffs and Appellants, | (Super.Ct.No. CIVDS1503985) |
| v. | OPINION |
| CITY OF UPLAND et al., | |
| Defendants and Respondents. | |

APPEAL from the Superior Court of San Bernardino County. David Cohn, Judge. Reversed with directions.

Roger Jon Diamond for Plaintiffs and Appellants.

Jones & Mayer, James R. Touchstone and Krista MacNevin Jee for Defendants and Respondents.

I

INTRODUCTION

Petitioner California Cannabis Coalition, a California nonprofit corporation, and Nicole De La Rosa and James Velez (collectively, CCC), appeal judgment entered after

1

the trial court denied CCC's petition for writ of mandate (writ petition). CCC's writ petition requested the trial court to order the City of Upland and city clerk, Stephanie Mendenhall, (collectively, the City) to hold a special election on CCC's medical marijuana dispensary initiative (Initiative).

CCC contends the trial court erred in ruling CCC's Initiative could not be voted on during a special election under Article XIIIC (Article 13C), section 2 of the California Constitution, because the Initiative imposes a charge on medical marijuana dispensaries, which in effect is a general tax rather than a regulatory fee. CCC objects to the trial court requiring the Initiative to be placed on the next general election ballot, instead of presenting it to the voters earlier by holding a special election. CCC further argues the City council prematurely determined, before the election on the Initiative, that the Initiative constituted a tax rather than a regulatory fee.

CCC requests this court reverse the trial court judgment and order the trial court to issue a writ of mandate compelling the City to hold a special election on the Initiative. CCC suggests, in the interest of expediency, this court treat the instant appeal as a writ petition and directly order the City to call a special election on the Initiative, to be consolidated with the June 7, 2016 primary.

We conclude Article 13C, section 2 does not apply to CCC's Initiative. Article 13C, sections 1 and 2 refer to taxes imposed by local government. Article 13C is silent as to taxes imposed by initiative. Article 2, sections 8 and 11 of the California Constitution and Elections Code sections 1405 and 9214, on the other hand, provide the people with initiative powers and state procedures for holding elections on initiatives.

2

Under Article 2 and Elections Code section 1405 and 9214, the City is required to place the Initiative on a special election ballot. The trial court's ruling and judgment denying CCC's writ petition is therefore reversed, and the trial court is directed to issue a writ of mandate compelling the City to place the Initiative on a special ballot in accordance with Article 2, sections 8 and 11, and Elections Code sections 1405 and 9214. We reject CCC's request to treat this appeal as a petition for writ of mandate so that this court can issue a writ directly to the City directing it to place the initiative on the next ballot, because CCC has not cited any persuasive authority, and we are not aware of any, allowing this court to do so.

II

FACTS AND PROCEDURAL BACKGROUND

On March 19, 2015, CCC filed a petition for writ of mandate and motion for peremptory writ of mandate (writ motion). The facts alleged in the writ petition are undisputed. CCC alleges in the writ petition the following facts. CCC is a California nonprofit corporation. CCC sponsored and drafted a proposed medical marijuana initiative petition. The key provisions of the Initiative are that the Initiative would repeal existing City code provisions prohibiting medical marijuana dispensaries and would adopt regulations permitting and establishing standards for the operation of medical marijuana dispensaries within the City. The proposed Initiative allows the City to permit a maximum of three medical marijuana dispensaries. An applicant must obtain a business license and applicable City permits. According to the Initiative, a medical marijuana dispensary must pay the City an "annual Licensing and Inspection fee" of

3

$75,000 (Initiative § 17.158.100). Initiative proponents, Nicole De La Rosa and James Velez, presented the Initiative petition to the City.

Before circulating the Initiative petition, Nicole De La Rosa and James Velez filed with the City a notice of intention to circulate the Initiative petition. The City attorney prepared a title and summary for the Initiative. Thereafter, a notice of intention to circulate the Initiative petition was published and circulated.

The Initiative requested it be considered at a special election. At least 5,542 signatures (15 percent of registered voters) were needed for the Initiative to qualify for a special election, which would be held sooner than the next regular election. The County of San Bernardino Registrar reported there were 6,865 signatures on the Initiative petition. On February 9, 2015, the City council accepted the county certificate of sufficiency from the San Bernardino County Registrar of Voters and ordered an Agency Report.

**The City Agency Report**

The Agency Report dated March 4, 2015 (Agency Report), was prepared jointly by City departments under Elections Code section 9212, to address the anticipated impacts of the Initiative on the City. The Agency Report concluded the Initiative's $75,000 licensing and inspection fee exceeded the estimated actual costs incurred from issuing a license for a medical marijuana dispensary and conducting annual inspections of the dispensary. The City estimated the actual annual costs would total $15,014.28. Because the $75,000 licensing and inspection fee imposed by the Initiative exceeded the anticipated costs of licensing and inspection of a medical marijuana dispensary, the City

4

concluded in the Agency Report that the $75,000 fee is a general tax, which must be presented to voters at a regularly scheduled election under Article 13C. In reaching this conclusion, the City relied on the reports provided by the City's departments, which are included in the Agency Report.

The City Attorney reported in the Agency Report that the annual $75,000 licensing and inspection fee was a general tax, which under the California Constitution, must be submitted to voters at a regularly scheduled election and cannot appear on a special election ballot. The Development Services Department (Development Services) reported in the Agency Report that the estimated cost of processing a typical permit for a medical marijuana dispensary was $9,379.28, with an estimated $7,000 in cost-recovery from additional fees charged for processing the application. Development Services estimated the annual inspection cost for a single medical marijuana dispensary totaled $4,000. Development Services estimated a medical marijuana dispensary would generate $84,480 per year in sales tax revenue.

The City Administrative Services Director, Stephanie Mendenhall, summarized in the Agency Report the City departments' reported costs for obtaining a medical marijuana dispensary permit and for an annual permit inspection as follows. The fire department determined its initial costs for processing a typical medical marijuana dispensary permit would be $1,443, with the additional annual cost of $292 for two biannual inspections to ensure compliance with the Uniform Fire Code. Development Services estimated an initial cost of $9,279.28 for processing a typical permit and $4,000 annually for an annual permit inspection by the Building and Planning Divisions. The

5

total estimated cost for obtaining a medical marijuana permit amounted to $10,722.28. The total estimated cost for annual permit inspections was $4,292. Mendenhall further reported in the Agency Report that the estimated cost of a standalone special election was $179,800. The estimated cost of placing the Initiative on the 2016 Statewide Election (regularly scheduled election) was $25,000.

**March 9, 2015 City Council Meeting**

On March 9, 2015, the City council met. The City received the Agency Report and the City attorney provided additional information contained in the Agency Report. The City council discussed whether the Initiative's $75,000 licensing and inspection fee is a tax and whether it must be placed on a special or general election ballot. The City council adopted Resolution No. 6267, finding the Initiative's $75,000 fee is actually a tax because it exceeds the actual licensing and inspection costs, and the Initiative does not specifically provide any legally binding mandate for use of the excess revenue generated from the $75,000 fee. The excess revenue would thus by default be deposited into the City's general fund used for general governmental purposes. The City determined the Initiative did not qualify for a special election under Elections Code sections 1405 and 9214, because under Article 13C the Initiative imposed a general tax. Resolution No. 6267 therefore provides notice and direction for ordering the Initiative submitted to the voters at the next general election on November 8, 2016.

**Writ Petition Allegations**

CCC alleges in its writ petition that the Initiative is not subject to Article 13C because the Initiative fee is not a tax and is not imposed by a local government. Rather,

6

if adopted, the Initiative fee would be imposed by the voters by initiative. CCC also alleges that, even if the $75,000 licensing and inspection fee is a tax, the remedy would be to allow the Initiative to go on the special election ballot. Then, if erroneously approved, the court could strike the Initiative or strike only the section imposing the $75,000 fee. CCC concludes that the City's failure to place the Initiative on a special ballot therefore violates Elections Code section 9214.

CCC further alleges the City refuses to allow CCC to participate in any discussion or hearing determining whether the Initiative imposes a general tax. In addition, Initiative section 17.158.100 allegedly is only a minor part of the overall Initiative and would only affect the three proposed medical marijuana dispensaries. CCC asserts in its writ petition the City took the position the Initiative imposes a general tax because the City is against the Initiative. CCC further alleges the City's position allegedly is a pretext and serves no legitimate purpose. CCC concludes the City's refusal to place the Initiative on a special election ballot violates CCC's rights under the Elections Code and California Constitution. CCC's writ petition therefore requests the trial court to issue a writ of mandate compelling the City and City clerk to place the Initiative on a special election ballot in compliance with Elections Code section 9214.

**Hearing on Writ Motion and Petition**

The City filed an answer and amended answer to CCC's writ petition and opposition to CCC's writ motion. The City argued CCC's writ motion was premature and procedurally improper, and the Initiative imposes a tax, requiring placing the Initiative on a general election ballot. The City also lodged materials with the trial court

7

in support of the City's opposition to CCC's writ motion. The materials included a binder of information entitled "Marijuana and the Drug Cartels," and an accountant report dated February 22, 2015, entitled "Compliance Summary & Checklist for Lawful Operation of medical marijuana dispensary in the City of Upland California" (accountant report). These materials were submitted to the City council for consideration regarding the Initiative during the March 9, 2015 City council meeting.

The accountant report was prepared by New Era Certified Public Accountants, LLP (New Era), which specializes in accounting and tax preparation services for medical marijuana dispensaries. The accountant report provided a list of compliance areas, including licensing and permits, and estimated related costs incurred by cities and counties. New Era estimated the total annual cost of the enforcement procedures itemized in the accountant report totaled $56,540 per dispensary, plus an additional annual $10,000 per dispensary to cover possible fees resulting from a noncompliant dispensary failing to comply with applicable regulations and guidelines, which could lead to revocation or suspension of a license.

On May 19, 2015, the trial court heard oral argument on CCC's writ motion. Without addressing whether Article 13C, section 2 applies to initiatives that impose a tax, the trial court denied CCC's writ petition and motion, finding that the $75,000 fee imposed by the Initiative qualified as a tax and therefore the Initiative was required to be placed on the next general election ballot. On June 5, 2015, the trial court entered judgment in favor of the City and against CCC on each allegation in CCC's writ petition. Although CCC filed a premature notice of appeal of the May 19, 2015, ruling before

8

entry of judgment, this court ordered the premature notice of appeal construed as an appeal of the judgment.

III

THE APPEAL IS NOT MOOT

"Generally, an appeal will be dismissed as 'moot when any ruling by this court can have no practical impact or provide the parties effectual relief. [Citation.]' [Citations.]" (*Alliance for a Better Downtown Millbrae v. Wade* (2003) 108 Cal.App.4th 123, 128 (*Wade*).) This case presents an actual controversy.

The parties agree that CCC's appeal is not moot. (See *Jeffrey v. Superior Court* (2002) 102 Cal.App.4th 1, 4-5.) However, by the time this decision becomes final, it may be too late to place the Initiative on the June 2016 ballot. (Elect. Code, § 1405.) CCC has requested, and this court granted on January 6, 2016, expedited review and calendar preference. Even if it is too late to place the Initiative on the June 7, 2016 election ballot, this appeal would not be moot because the issue will remain as to whether Article 13C applies to the Initiative.

IV

STANDARD OF REVIEW

When reviewing the trial court's ruling denying CCC's petition for a writ of mandate to compel a special election on the Initiative, this court """need only review the record to determine whether the trial court's findings are supported by substantial evidence."' [Citations.] However, we review questions of law independently. [Citation.] Where, as here, the facts are undisputed and the issue involves statutory

9

interpretation, we exercise our independent judgment and review the matter de novo. [Citation.]" (*Wade, supra,* 108 Cal.App.4th at p. 129.) The issues raised here, of whether imposition of the Initiative's $75,000 fee is a tax or a fee and whether pursuant to Article 13C, section 2, the Initiative must be placed on a special election ballot, are questions of law for this court to decide on an independent review of the facts. (*Weisblat v. City of San Diego* (2009) 176 Cal.App.4th 1022, 1040 (*Weisblat*).) "The construction of [a] statute or an initiative, including the resolution of any ambiguity, is a question of law that we review de novo." (*Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, 1317 (*Schmeer*).)

V

LAW APPLICABLE TO WRITS OF MANDATE

A challenge to ministerial acts by local officials under Code of Civil Procedure section 1085, may be brought by a petition for writ of mandate. "To obtain such a writ, the petitioner must show (1) a clear, present, ministerial duty on the part of the respondent and (2) a correlative clear, present, and beneficial right in the petitioner to the performance of that duty. [Citations.]" (*Wade, supra,* 108 Cal.App.4th at pp. 128-129.) The City clerk's act of placing CCC's Initiative on a general or special election ballot qualifies as a ministerial duty because it is "an act that a public officer is obligated to perform in a prescribed manner required by law when a given state of facts exists." (*Id.* at p. 129.)

Issuance of a writ of mandate is not necessarily a matter of right. (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 593.) Rather, issuance of a writ

10

of mandate lies within the discretion of the court.  However, where one has a substantial right to protect or enforce, which may be accomplished by such a writ, and there is no other plain, speedy and adequate remedy, the petitioner is entitled as a matter of right to the writ.  (*Ibid.*)  It would be an abuse of discretion to refuse it.  (*Ibid.*)

## VI

## ARTICLE 13C DOES NOT APPLY TO CCC'S INITIATIVE

CCC contends that, even assuming the $75,000 fee imposed by the Initiative qualifies as a tax, Article 13C, section 2 does not apply because Article 13C is limited to taxes imposed by government, not by initiative.  Therefore Article 13C does not preclude the Initiative from being placed on a special election ballot under Elections Code sections 1405 and 9214.

*A.  Laws Applicable to Placing a Measure on an Election Ballot*

Article 2, sections 8 and 11, and Elections Code sections 1405 and 9214 instruct on placing an Initiative on an election ballot.  Article 13C provides voting requirements for taxes imposed by local government.

**Elections Code Section 9214**

Elections Code section 9214 provides that, "If the initiative petition is signed by not less than 15 percent of the voters of the city according to the last report of registration by the county elections official to the Secretary of State . . . and contains a request that the ordinance be submitted immediately to a vote of the people at a special election, the legislative body shall do one of the following:

"(a) Adopt the ordinance, without alteration, at the regular meeting at which the

11

certification of the petition is presented, or within 10 days after it is presented.

"(b) Immediately order a special election, to be held pursuant to subdivision (a) of Section 1405, at which the ordinance, without alteration, shall be submitted to a vote of the voters of the city.

"(c) Order a report pursuant to Section 9212 at the regular meeting at which the certification of the petition is presented. When the report is presented to the legislative body, the legislative body shall either adopt the ordinance within 10 days or order an election pursuant to subdivision (b)."

In the instant case, the Initiative petition was signed by over 15 percent of the City voters, thereby qualifying the Initiative for placement on a special election ballot under Elections Code section 9214. The City council ordered a report pursuant to section 9212, on the impact of the Initiative on the City. After the City Agency Report was presented to the City, the City ordered a regular election, instead of a special election.

**Propositions 13, 218, and 26**

The City argues the Initiative imposes a general tax and therefore Elections Code section 9214 is superseded by Article 13C, which requires the Initiative to be placed on the next regularly scheduled general election, on November 8, 2016. Article 13C, was enacted when voters passed Proposition 218 in 1996, "to implement Proposition 13, the predecessor initiative that voters passed in 1978 to constrain the taxation powers of state and local government." (*Weisblat, supra,* 176 Cal.App.4th at p. 1033, *Schmeer, supra,* 213 Cal.App.4th at p. 1317.)

12

Determining whether a fee or levy is a tax "has been a recurring task since 1978 when California voters added article XIIIA, commonly known as the Jarvis-Gann Property Tax Initiative or Proposition 13 (art. 13A), to our state Constitution. [Citations.] The purpose of the initiative was to assure effective real property tax relief." (*Weisblat, supra,* 176 Cal.App.4th at p. 1034.) Article 13A, section 4 restricts local taxes and permits local governmental entities to impose "special taxes" only if approved by a two-thirds vote of the electorate. (*Weisblat,* at p. 1034.) "Unlike taxes, fees are not subject to the voter approval limitation of Article 13A, section 4." (*Id.* at p. 1035.) The California Supreme Court in *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866 (*Sinclair*), noted that a "'tax' has no fixed meaning, and that the distinction between taxes and fees is frequently 'blurred,' taking on different meanings in different contexts. [Citations.]" (*Id.* at p. 874; italics added.)

In response to *Sinclair* and the proliferation of governmental entities raising revenues through sales taxes without voter approval, Proposition 218, entitled the "Right to Vote on Taxes Act," passed in 1996. (*Schmeer, supra,* 213 Cal.App.4th at p. 1319.) Proposition 218 added to the California Constitution Articles 13C and 13D, which imposed additional approval requirements on the imposition of taxes by state and local government. (*Schmeer,* at p. 1319; *Weisblat, supra,* 176 Cal.App.4th at p. 1038; *Bay Area Cellular Telephone Co. v. City of Union City* (2008) 162 Cal.App.4th 686, 692 (*Bay Area Cellular*).) Proposition 218 states its purpose is the following: "The people of the State of California hereby find and declare that Proposition 13 was intended to provide effective tax relief and to require voter approval of tax increases. However, local

13

governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of voter approval for tax increases, but also threaten the economic security of all Californians and the California economy itself. This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) text of Prop. 218, § 2, p. 108, reprinted in Historical Notes, 2B *West's Ann. Cal. Const.* (2013) art. 13C, § 2, p. 363; see *Bay Area Cellular, supra,* 162 Cal.App.4th at pp. 692-693.)

"Proposition 218, like Proposition 13, limits the power of local governments to impose taxes. [Citation.] 'Section 5 of Proposition 218 required that the provisions of the act be "liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent."' [Citation.]" (*Weisblat, supra,* 176 Cal.App.4th at p. 1039, quoting *Pajaro Valley Water Management Agency v. Amrhein* (2007) 150 Cal.App.4th 1364, 1378 (*Pajaro*) and *Bay Area Cellular, supra,* 162 Cal.App.4th at p. 692.)

**Article 13C, Sections 1 and 2**

Section 2(a) of Article 13C, added by Proposition 218, provides that "All taxes imposed by any local government shall be deemed to be either general taxes or special taxes." Article 13C, section 1(a) defines "general tax" as "any tax imposed for general governmental purposes'; that is, "when its revenues are placed into the general fund and are available for expenditure for any and all governmental purposes. [Citation.]" (*Howard Jarvis Taxpayers Assn. v. City of Roseville* (2003) 106 Cal.App.4th 1178,

14

1185.)  Under Article 13C, section 2(b) of Proposition 218, "[n]o local government may impose, extend, or increase any general tax" until the matter is "submitted to the electorate and approved by a majority vote."  (Art. 13C, § 2, subd. (b).)

Article 13C, section 1(d) defines a "special tax" as "any tax imposed for specific purposes, including a tax imposed for specific purposes, which is placed into a general fund."  "'[A] tax is special whenever expenditure of its revenues is limited to specific purposes; this is true even though there may be multiple specific purposes for which [the] revenues may be spent.'  [Citation.]  Under Proposition 218, '[n]o local government may impose, extend, or increase any special tax' until the matter is 'submitted to the electorate and approved by a two-thirds vote.'  (Art. 13C, § 2, subd. (d).)"  (*Weisblat, supra,* 176 Cal.App.4th at pp. 1039-1040.)

In 2010, California voters approved Proposition 26, which added section 1(e) to Article 13C.  "Proposition 26 expanded the definition of taxes so as to include fees and charges, with specified exceptions; required a two-thirds vote of the Legislature to approve laws increasing taxes on any taxpayers; and shifted to the state or local government the burden of demonstrating that any charge, levy or assessment is not a tax." (*Schmeer, supra,* 213 Cal.App.4th at p. 1322.)  Proposition 26 amended section 3 of Article 13A and section 1 of Article 13C.  Proposition 26 attempted to close perceived loopholes in Propositions 13 and 218.  (*Schmeer,* at p. 1322.)

As concisely stated in *Schmeer,* "Proposition 26, in an effort to curb the perceived problem of a proliferation of regulatory fees imposed by the state without a two-thirds vote of the Legislature or imposed by local governments without the voters' approval,

15

defined a 'tax' to include 'any levy, charge, or exaction of any kind imposed by' the state or a local government, with specified exceptions." (*Schmeer, supra,* 213 Cal.App.4th at p. 1326.)

B. *Construing Voter Initiatives*

Here, the dispositive issue is whether Article 13C applies to the Initiative, which imposes a $75,000 fee. We need not reach the issue of whether the fee is a tax under Article 13C because, regardless, Article 3, section 2 does not apply to the Initiative. This is because Article 13C, section 2 is limited to taxes imposed by local government and is silent as to imposing a tax by initiative.

In construing Article 13C, we are required to apply the same principles governing the construction of a statute. (*Schmeer, supra,* 213 Cal.App.4th at p. 1316.) "Our task is to ascertain the intent of the electorate so as to effectuate the purpose of the law. [Citation.] We first examine the language of the initiative as the best indicator of the voters' intent. [Citation.] We give the words of the initiative their ordinary and usual meaning and construe them in the context of the entire scheme of law of which the initiative is a part, so that the whole may be harmonized and given effect. [Citations.] [¶] If the language is unambiguous and a literal construction would not result in absurd consequences, we presume that the voters intended the meaning on the face of the initiative and the plain meaning governs. [Citations.] If the language is ambiguous, we may consider the analyses and arguments contained in the official ballot pamphlet as extrinsic evidence of the voters' intent and understanding of the initiative. [Citation.]" (*Id.* at pp. 1316-1317.)

16

*C. Is the Initiative subject to Article 13C, section 2?*

CCC argues that Article 13C does not apply to the Initiative because it is limited to taxes imposed by local government. We agree. Article 13C, section 1(e) defines a tax as "any levy, charge, or exaction of any kind *imposed by a local government*," subject to seven specified exceptions. (Art. 13C, § 1(e); italics added.) Article 13C, section 1(e) does not expressly include fees imposed by initiative. Because Article 13C is silent in this regard, we decline to construe Article 13C as applying to taxes imposed by initiative.

The City relies on *Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809 (*La Habra*) for the proposition a tax imposed by local government refers to, not only enactment of a tax by local government, but also its continuing collection by and payment to a local government. But *La Habra* is not on point. It concerns Proposition 62, which in 1986, added Government Code sections 53727[1] and 53728.[2] These

---

[1] Government Code section 53727 states: "(a) Neither this Article, nor Article XIII A of the California Constitution, nor Article 3.5 of Division 1 of Title 5 of the Government Code (commencing with § 50075) shall be construed to authorize any local government or district to impose any general or special tax which it is not otherwise authorized to impose; provided, however, that any special tax imposed pursuant to Article 3.5 of Division 1 of Title 5 of the Government Code prior to August 1, 1985 shall not be affected by this section.

"(b) Any tax imposed by any local government or district on or after August 1, 1985, and prior to the effective date of this Article, *shall continue to be imposed* only if approved by a majority vote of the voters voting in an election on the issue of imposition, which election shall be held within two years of the effective date of this Article. Any local government or district which fails to seek or obtain such majority approval shall cease to impose such tax on and after November 15, 1988." (Italics added.)

provisions address taxes imposed by government without voter approval, before Proposition 62 took effect, which the city continues to collect.

In *La Habra, supra,* 25 Cal.4th 809, the city adopted an ordinance establishing a utility users tax to raise revenue for general government purposes. The *La Habra* court held the statute of limitations had not run on the petitioner's challenge to the City of La Habra's continuing collection of a tax without obtaining voter approval of the tax. In reaching its holding, the court stated in *La Habra* that "the City's allegedly illegal actions include not only the Ordinance's initial enactment, but also the City's *continued collection*, through the agency of the service providers, of an unapproved tax." "Government Code section 53728, moreover, provides a remedy against a city's continued collection of a tax that has not been approved by the voters, requiring the responsible county official to withhold property tax transfers in a dollar amount equal to the illegal collections. Clearly the intent of Proposition 62's enactors was not merely to preclude enactment of a tax ordinance without voter approval, but to *preclude continued*

---

*[footnote continued from previous page]*

[2] Government Code section 53728 states: "If any local government or district imposes any tax without complying with the requirements of this Article, or in excess of its authority as clarified by Section 53727, whether or not any provision of Section 53727 is held not applicable to such jurisdiction, the amount of property tax revenue allocated to the jurisdiction pursuant to Chapter 6 of part 0.5 of Division 1 of the Revenue and Taxation Code (commencing with Section 95) shall be reduced by one dollar ($1.00) for each one dollar ($1.00) of revenue attributable to such tax for each year that the tax is collected. Nothing in this section shall impair the right of any citizen or taxpayer to maintain any action to invalidate any tax imposed in violation of this Article."

18

*imposition or collection* of such a tax as well." (*La Habra, supra,* 25 Cal.4th at p. 824; italics added.)

In *La Habra, supra,* 25 Cal.4th at pages 823-824, the court further explained: "[T]he City appears to contend that Proposition 62 can be violated *only* at the time a tax ordinance is first enacted because, in the City's view, all Proposition 62 prohibits is 'imposition' of a tax without voter approval, and imposition is limited to the time of initial enactment. Both premises are faulty. Government Code section 53727, subdivision (b), which governs taxes imposed prior to the measure's passage, provides that no such tax '*shall continue to be imposed*' without a vote within two years of the measure's effective date, and that a taxing jurisdiction that fails to obtain a majority vote 'shall cease to impose such tax on and after November 15, 1988.' Clearly, *in this provision, "imposition" is not limited to the time of initial enactment*, and nothing in Proposition 62 suggests that it was used in a more restricted sense in Government Code section 53723,[3] the prohibitory provision at issue here. Government Code section 53728, moreover, provides a remedy against a city's *continued collection* of a tax that has not been approved by the voters, requiring the responsible county official to withhold property tax transfers in a dollar amount equal to the illegal collections. *Clearly the intent of Proposition 62's enactors was not merely to preclude enactment of a tax*

---

[3] Government Code section 53723 states: "No local government, or district, whether or not authorized to levy a property tax, may impose any general tax unless and until such general tax is submitted to the electorate of the local government, or district and approved by a majority vote of the voters voting in an election on the issue."

*ordinance without voter approval, but to preclude continued imposition or collection of such a tax as well*." (Italics added.)

The instant case is distinguishable from *La Habra*. *La Habra* is founded on Proposition 62 and statutory language that expressly prohibits, not only taxes imposed by government without voter approval, but also taxes imposed by local government before adoption of Proposition 62, which the government has *continued* to impose without obtaining voter approval of the taxes. There is no similar language in Proposition 218 (Article 13C) or Proposition 26, from which this court can reasonably infer Propositions 218 and 26 are intended to encompass taxes local government collects after they have been imposed by initiative, in which there has been voter approval.

The purpose and intent of Propositions 13 and 218 is to limit the power of local governments to impose taxes by imposing voting requirements. "'Section 5 of Proposition 218 required that the provisions of the act be "liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent."' [Citation.]" (*Weisblat, supra,* 176 Cal.App.4th at p. 1039, quoting *Pajaro, supra,* 150 Cal.App.4th at p. 1378 and *Bay Area Cellular, supra,* 162 Cal.App.4th at p. 692; italics added; see *Howard Jarvis Taxpayers Assn. v. City of Riverside* (1999) 73 Cal.App.4th 679, 681-682.) As explained in *Howard Jarvis Taxpayers Assn. v. City of Roseville* (2002) 97 Cal.App.4th 637, 640, in adopting Proposition 218 adding Article 13C, "the people found and declared '"that Proposition 13 was intended to provide effective tax relief and to require voter approval of tax increases. However, local governments have subjected taxpayers to excessive tax, assessment, fee and charge

20

increases that not only frustrate the purposes of voter approval for tax increases, but also threaten the economic security of all Californians and the California economy itself. This measure protects taxpayers by limiting the *methods by which local governments exact revenue from taxpayers without their consent*."'" (Italics added.)

Likewise, the purpose of Proposition 26, which amended Article 13C by adding section 1(e), was to "curb the perceived problem of a proliferation of regulatory fees *imposed by the state* without a two-thirds vote of the Legislature or *imposed by local governments* without the voters' approval" by defining "a 'tax' to include 'any levy, charge, or exaction of any kind imposed by' the state or a local government, with specified exceptions." (*Schmeer, supra,* 213 Cal.App.4th at p. 1326; italics added.) As stated in Proposition 26's "Findings and Declarations of Purpose," Proposition 26 was passed in response to "the recent phenomenon whereby the Legislature and local governments have disguised new taxes as 'fees' in order to extract even more revenue from California taxpayers without having to abide by these constitutional voting requirements. Fees couched as 'regulatory' but which exceed the reasonable costs of actual regulation or are simply imposed to raise revenue for a new program and are not part of any licensing or permitting program are actually taxes and should be subject to the limitations applicable to the imposition of taxes." (Ballot Pamp., Gen. Elec. (Nov. 2, 2010) text of Prop. 26, § 1, subd. (e), p. 114; see *Weisblat, supra,* 176 Cal.App.4th at p. 1323.) Proposition 26 further states that, "[i]n order to ensure the effectiveness of these constitutional limitations, this measure also defines a 'tax' for state and local purposes so that neither the Legislature nor local governments can circumvent these restrictions on

21

increasing taxes by simply defining new or expanded taxes as 'fees.'" (Ballot Pamp., Gen. Elec. (Nov. 2, 2010) text of Prop. 26, § 1, subd. (f), p. 114; see *Weisblat, supra,* 176 Cal.App.4th at p. 1323.)

Taxation imposed by initiative is not taxation imposed by local government. We do not construe the term "impose" to include, not only creating or enacting a tax, but also collecting or receiving tax proceeds after the tax has been enacted. The dictionary defines "impose" as "to establish." (*Ponderosa Homes, Inc. v. City of San Ramon* (1994) 23 Cal.App.4th 1761, 1770 (*Ponderosa*), citing Webster's Third Internat. Dict. (1970) p. 1136, in construing "impose" as used in the Mitigation Fee Act; see *Proposition 218 Implementation Guide, September 2007 Edition*, p. 60, by the League of Cities, found at <https://www.cacities.org/UploadedFiles/LeagueInternet/c2/c2f1ce7c-2b14-45fe-9aaa-d3dd2e0ffecc.pdf> and *Proposition 26 Implementation Guide, April 2011*, pp. 9-10, by the League of Cities, found at <http://www.cacities.org/Resources-Documents/Policy-Advocacy-Section/Hot-Issues/Proposition-26-Implementation-Guide>. Webster's New World Dictionary defines "impose" as "to place or set (a burden, tax, fine, etc. *on* or *upon*) as by authority." (Webster's New World Dict. (3d college ed. 1988) p. 678.)

Although not binding authority, the Proposition 26 Implementation Guide, citing *Ponderosa, supra,* 23 Cal.App.4th at p. 1770, discusses the meaning of the term "impose," as follows: "By its terms, Proposition 26 applies only to fees that are "imposed' by government. Fees imposed by private parties (like telephone charges and many solid waste collection fees) are not within the scope of Proposition 26. Moreover, many fees collected by local governments are not 'imposed' by them, either because local

22

government is collecting a fee imposed by the state or because the fee is voluntarily paid. Courts can be expected to rely, as they have in similar contexts, on the dictionary meaning of 'impose,' which is to establish or apply by authority or force." (*Proposition 26 Implementation Guide, April 2011*, by the League of Cities, pp. 9-10, found at <http://www.cacities.org/Resources-Documents/Policy-Advocacy-Section/Hot-Issues/Proposition-26-Implementation-Guide>.)

In *Ponderosa, supra,* 23 Cal.App.4th 1761, the court addressed the question of "whether the 'imposition of fees' in [*Ponderosa*] occurred when the City first set the traffic mitigation fees as a condition on its tentative subdivision map approval, or when Ponderosa paid an installment on the fees already required by the City." (*Id.* at p. 1669.) Ponderosa Homes, Inc. (Ponderosa Homes) argued that no cause of action protesting development project fees Government Code section 66020 accrues "'until the challenged fee is paid, because section 66020, subdivision (a) establishes as the two prerequisites for a fee protest both the tender of the required payment in full and written notice that the payment is being tendered under protest.'" (*Ponderosa* at p. 1770.)[4] The *Ponderosa* court disagreed, stating: "The phrase 'to impose' is generally defined to mean to establish or apply by authority or force, as in 'to impose a tax.' (Webster's Third New Internat. Dict. (1970) p. 1136.) *There is a logical distinction between the act of imposing*

---

[4] Government Code section 66020 states in relevant part: "(a) Any party may protest the imposition of any fees, dedications, reservations, or other exactions *imposed* on a development project, as defined in Section 66000, *by a local agency* by meeting both of the following requirements . . ." (Italics added.)

23

*something and the act of complying with that which has been imposed.* As applicable here, *the phrase refers to the creation of a condition or fee by authority of local government; it is not synonymous with the act of complying with that condition or fee. Just as creation is different from compliance, so is 'imposition' of a fee different from payment thereof.*" (*Ponderosa,* at p. 1770; italics added.)

The court in *Ponderosa* further explained that "[t]he statutory definition of 'imposition of fees' does not contradict this interpretation. Section 66020, subdivision (h) states that 'imposition of fees, dedications, reservations, or other exactions occurs . . . when they are imposed or levied on a specific development.' The statute does not say that imposition occurs 'when they are paid or complied with.'" (*Ponderosa, supra,* 23 Cal.App.4th at p. 1770, citing Webster's Third New Internat. Dict., *supra*, p. 1301.) The court in *Ponderosa* therefore concluded that Ponderosa Homes's payment of the required map processing fee "simply constituted the satisfaction of the condition already imposed earlier," and was not paid at the time the government imposed the fee. (*Id.* at p. 1771.)

Likewise, here, based on our review of Propositions 13, 218, and 26 as whole and taking into consideration the stated intent of these propositions (preventing government from imposing taxes without voter approval), we conclude the drafters, proponents, and voters of Propositions 13, 218 and 26 did not intend the language, "imposed by local government," to encompass taxes imposed by initiative, but later collected or received by local government.

The only mention of the initiative power in Article 13C is in section 3, which clarifies that, "[n]otwithstanding any other provision of this Constitution, including, but

24

not limited to, Sections 8 and 9 of Article II, the initiative power shall not be prohibited or otherwise limited in matters of *reducing or repealing* any local tax, assessment, fee or charge. The power of initiative to affect local taxes, assessments, fees and charges shall be applicable to all local governments and *neither the Legislature nor any local government charter shall impose* a signature requirement higher than that applicable to statewide statutory initiatives." (Italics added.) Even though there is no mention also of initiatives that impose, increase, or extend a local tax, there is no language in Article 13C stating it applies to such initiatives. To conclude otherwise would interfere with the initiative power provided in Article 2, sections 8 and 11 of the California Constitution.

CCC's Initiative and Article 2, sections 8 and 11, "must be construed liberally in favor of the people's right to exercise the reserved powers of initiative and referendum. The initiative and referendum are not rights 'granted the people, but . . . power[s] reserved by them. Declaring it "the duty of the courts to jealously guard this right of the people" [citation], the courts have described the initiative and referendum as articulating "one of the most precious rights of our democratic process" [citation]. "[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right not be improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it."'" (*Rossi v. Brown* (1995) 9 Cal.4th 688, 695 (*Rossi*); *Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591.) This is because, "as its name suggests, the initiative allows voters to *propose* new legislation" (*Jahr v. Casebeer* (1999) 70 Cal.App.4th 1250, 1259; see Cal. Const., art. II, § 8), and allows "local as well as

25

statewide voters to take legislative action without the aid or interference of their elected officials." (*Id.* at p. 1259; see Cal. Const., art. II, § 11; *AFL-CIO v. Deukmejian* (1989) 212 Cal.App.3d 425, 430.)

Article II, section 8 of the California Constitution creates the statewide initiative power. (*Rossi, supra,* 9 Cal.4th at p. 695.) It provides in pertinent part:

"(a) The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them.

"(b) An initiative measure may be proposed by presenting to the Secretary of State a petition that sets forth the text of the proposed statute . . . and is certified to have been signed by electors equal in number to 5 percent in the case of a statute . . . of the votes for all candidates for Governor at the last gubernatorial election.

"(c) The Secretary of State shall then submit the measure at the next general election held at least 131 days after it qualifies or at any special statewide election held prior to that general election. The Governor may call a special statewide election for the measure. . . ."

Article 2, section 11 of the Constitution further provides: "(a) Initiative and referendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide." "The local initiative power may be even broader than the initiative power reserved in the Constitution." (*Rossi, supra,* 9 Cal.4th at p. 696.) The initiative procedures that the Legislature has enacted are included in Elections Code sections 1405 and 9214. The constitutional grant of authority to the

26

Legislature to pass laws regarding taxation does not limit the people's plenary power of initiative, and that power may be used to enact or repeal taxes. (*Rossi,* at p. 709.)

The City has agreed to place CCC's Initiative on the next regularly scheduled general election ballot, in November 2016. CCC argues, however, that the City's refusal to place the Initiative on a special ballot unlawfully interferes with CCC's right of initiative by delaying voting on the Initiative until the next general election in November 2016. We agree. Article 2, sections 8 and 11, provide that at the request of an initiative's proponents, an initiative shall be placed on the ballot in accordance with procedures provided by the Legislature. Elections Code section 9214 provides that if the Initiative is not adopted by City ordinance, the City shall either immediately order a special election, to be held pursuant to subdivision (a) of section 1405, or the City shall order a report pursuant to Elections Code section 9212. The City ordered a report pursuant to Elections Code section 9212 and presented the report to the City council, which was then required to either adopt the Initiative by City ordinance within 10 days or order a special election for the Initiative.

Elections Code section 1405 provides in relevant part:

"(a) Except as provided below, the election for a county, municipal, or district initiative that qualifies pursuant to Section 9116, 9214, or 9310 shall be held not less than 88 nor more than 103 days after the date of the order of election.

"(1) When it is legally possible to hold a special election on an initiative measure that has qualified pursuant to Section 9116, 9214, or 9310 within 180 days prior to a regular or special election occurring wholly or partially within the same territory, the

election on the initiative measure may be held on the same date as, and be consolidated with, that regular or special election.

"(2) When it is legally possible to hold a special election on an initiative measure that has qualified pursuant to Section 9116, 9214, or 9310 during the period between a regularly scheduled statewide direct primary election and a regularly scheduled statewide general election in the same year, the election on the initiative measure may be held on the same date as, and be consolidated with, the statewide general election."

Here, the Initiative qualifies under section 9214 for a special election, since the Initiative petition was signed by at least 15 percent of the City voters and the initial Initiative petition contained a request that the initiative be submitted immediately to a vote of the people at a special election. Therefore the City is required to place the Initiative on a special election ballot. Where the City council "refuses to discharge its duty and fix a proper time for the election, it may be compelled to do so by mandamus." (*Blotter v. Farrell* (1954) 42 Cal.2d 804, 812-813.) The trial court therefore abused its discretion by denying CCC's writ petition to compel the City to place CCC's Initiative on a special ballot, as required under Article 2, sections 8 and 11, and Elections Code sections 1405 and 9214.[5]

---

[5] CCC urges this court to include in this decision and in the disposition guidance on when the special election on the Initiative should be set. Doing so would be premature and constitute an inappropriate advisory opinion, since this is matter which will turn on the facts and circumstances existing when the case is remanded to the trial court. The parties have not had an opportunity to fully consider the scheduling of the special election, taking into consideration the applicable law and circumstances affecting

*[footnote continued on next page]*

28

## VII

## DISPOSITION

The trial court's ruling and judgment denying CCC's writ petition is reversed, and the trial court is directed to issue a writ of mandate compelling the City to place the Initiative on a special ballot, in accordance with Article 2, sections 8 and 11, and Elections Code sections 1405 and 9214. CCC is awarded its costs on appeal as the prevailing party.

CERTIFIED FOR PUBLICATION

CODRINGTON

J.

We concur:


HOLLENHORST

       Acting P. J.


McKINSTER

          J.

---

*[footnote continued from previous page]*
the scheduling of the special election and whether the Initiative election must be consolidated with another election under the Elections Code and California Constitution.